**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────

**UNITED STATES OF AMERICA**                    **S1 00 Cr. 628 (JGK)**
                                                **S1 02 Cr. 1588(JGK)**

              – against –
                                                <u>**OPINION AND ORDER**</u>

**ALLEN Z. WOLFSON,**

                      Defendant.

────────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     The defendant has moved pursuant to Federal Rule of

Criminal Procedure 33 to vacate his guilty verdict in 00 Cr. 628

(the "Five Stock Indictment") and his guilty plea in 02 Cr. 1588

(the "Freedom Surf Indictment") on the grounds that he was

incompetent at the time of the trial and guilty plea.  The

defendant, represented by new counsel, claims that he was

incompetent under the well established standard in <u>Dusky v.</u>

<u>United States</u>, 362 U.S. 402 (1960) (per curiam) ("The defendant

must have (1) 'sufficient present ability to consult with his

lawyer with a reasonable degree of rational understanding' and

(2) 'a rational as well as factual understanding of the

proceedings against him.'").  He also claims that his previous

attorney provided ineffective assistance of counsel by not

raising the issue of incompetence to stand trial and enter a

guilty plea.  More recently, the defendant has also claimed that

- 1 -

his mental condition has deteriorated and that he is currently incompetent to be sentenced in these cases.

The Court has received extensive briefs from the parties and held an evidentiary hearing at which the defendant's trial counsel testified. The Court also held an evidentiary hearing at which an expert psychologist, Dr. Sanford L. Drob, testified for the defendant. Dr. Drob testified in general that, while he had not originally concluded that Mr. Wolfson was incompetent at the time of the original proceedings, Dr. Drob now concluded that Mr. Wolfson was incompetent at the time of the original proceedings in these cases. Dr. Drob also concluded that there was evidence that the defendant was now incompetent to be sentenced. Dr. Wilfred G. Van Gorp, an expert neuropsychologist, called by the defendant, did not purport to give any testimony with respect to the defendant's competence, but did conclude that the defendant was suffering from some brain damage in August 2006.

Dr. Stuart B. Kleinman, an expert psychiatrist called by the Government, concluded without reservation that the defendant was competent at the time of the original trial and guilty plea. However, Dr. Kleinman candidly did not offer an opinion as to the defendant's competence to be sentenced. He noted that the defendant's delusions had worsened over time and affect his

ability to express remorse and to express himself at sentencing, and affect his view of the motivations for the proceedings against him which Mr. Wolfson now views as motivated by a vast conspiracy to silence him.

For the reasons explained below, the Court concludes that the defendant was competent at the time of his trial and guilty plea and that there is no basis for the allegation that his counsel was ineffective in representing him. Therefore, the defendant's motion to vacate the jury verdict and guilty plea pursuant to Rule 33, and to grant new trials, is denied. However, the Court concludes that the defendant is currently incompetent to be sentenced and therefore should be committed to the custody of the Attorney General for care and treatment pursuant to 18 U.S.C. § 4244 until such time as he has recovered so that he can be sentenced.

## I.

On March 26, 2003, Mr. Wolfson was convicted following a jury trial of one count of conspiracy to commit securities fraud, wire fraud and commercial bribery, in violation of 18 U.S.C. § 371; five counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; and two counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2. (See S1 00 Cr. 628 (JGK) (the "Five Stock Indictment").) On

January 21, 2004, Mr. Wolfson was convicted upon his guilty plea of conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371; and securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. (See 02 Cr. 1588 (JGK) (the "Freedom Surf Indictment").)

The charges against Mr. Wolfson in the Five Stock Indictment relate to his participation in a conspiracy to manipulate the price of five stocks from in or about 1998 through June 2000, by using various methods to secretly control large blocks of stock in those companies, coupled with large payments to brokers to promote the stocks to customers who were not informed of the payments. The charges in the Freedom Surf Indictment arise from similar conduct regarding stock in an additional company, Freedom Surf, Inc., committed during the summer and fall of 2000 while Mr. Wolfson was on bail on the Five Stock Indictment.

While the defendant originally pleaded guilty before Magistrate Judge Peck in the Freedom Surf case, and that guilty plea was confirmed by another Judge, that case was transferred to this Court for purposes of a consolidated sentencing with the Five Stock Indictment.

On March 25, 2004, the Probation Office prepared a Presentence Investigation Report ("PSR") in anticipation of Mr.

4

Wolfson's sentence.  The Probation Office recommended that the Court sentence Mr. Wolfson principally to 240 months (20 years) imprisonment based on the magnitude of investor losses (in excess of $13 million), the defendant's criminal history, and the repeated nature of the defendant's conduct.

On March 6, 2006, almost three years after his convictions following the jury trial before this Court, Mr. Wolfson's new counsel filed a motion to set aside Mr. Wolfson's guilty verdict and vacate his guilty plea, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  In that motion, Mr. Wolfson's counsel claimed, among other things, that Mr. Wolfson had been mentally incompetent at the time of his trial and guilty plea. Counsel based this claim on the findings of Sanford L. Drob, Ph. D., a forensic psychologist, who had been hired by the defendant's trial counsel to evaluate Mr. Wolfson following his convictions in connection with sentencing.  Notably, in that report Dr. Drob did not find that Mr. Wolfson had been incompetent at the time of his trial or guilty plea.  (See Ex. A to Govt. letter dated Sept. 24, 2007, Forensic Psychological Evaluation of Dr. Drob dated March 30, 2004 ("Drob Report").) The Government consented to a competency hearing to address the defendant's claims.  The Court thereafter held two hearings, one on August 3, 2006, at which the defendant's trial counsel

testified and the second on October 1 and 2, 2007 at which the expert psychiatric witnesses for the defendant and the Government testified.

## II.

### A.

Christopher Bruno represented Mr. Wolfson in the trial of the Five Stock Indictment, during the guilty plea to the Freedom Surf Indictment and in preparation for sentencing.  In connection with sentencing, he retained Dr. Drob to examine the defendant.  Mr. Bruno's credible testimony at the evidentiary hearing held on August 3, 2006 strongly supports the conclusion that Mr. Wolfson was competent during the trial and guilty plea.

Mr. Wolfson hired Mr. Bruno in October 2002 based on a referral from another attorney.  (Bruno Tr. at 7.)[1]  In their first conversation, Mr. Wolfson and Mr. Bruno spent approximately three hours on the telephone discussing the nature of the defendant's case, the procedural status of his case, and the charges pending against him.  (Id.)  During that

---

[1]    Numerical references to "Bruno Tr." refer to the August 3, 2006 testimony of Christopher Bruno, Esq., Mr. Wolfson's trial counsel; "Drob Tr." refers to the October 1, 2007 testimony of Dr. Drob; "Van Gorp Tr." refers to the October 1, 2007 testimony of Dr. Van Gorp; and "Kleinman Tr." refers to the October 2, 2007 testimony of Dr. Kleinman.

conversation, Mr. Wolfson discussed the length of the
anticipated trial, the specific nature of the charges against
him, the specific transactions that were at issue, Mr. Wolfson's
background, including his criminal history, and an "in-depth
overview of the nature of the potential witnesses that would
testify against him." (Id. at 8.) Mr. Wolfson was "very
rational" and "had a very in-depth understanding of . . . the
procedural aspects of the case, and the substantive aspects of
the case." (Id.) Mr. Wolfson was "extremely" conversant about
the nature of the criminal prosecution and the roles of the
Court, the prosecutor and defense counsel. (Id.)

Between October 2002 and the trial in March 2003, Mr. Bruno
and Mr. Wolfson were "in constant contact on a daily basis by
telephone." (Id. at 9.) Mr. Wolfson "always made himself
available," and he and Mr. Bruno spoke four or five times a day
"in the area of 45 minutes to an hour each phone call." (Id.)
During that time, Mr. Bruno also met with Mr. Wolfson in person
over the course of several days, in New York, Utah and Central
Islip. (Id. at 10.) Mr. Wolfson was "very, very involved in . .
. examining all of the evidence" against him. (Id.) Mr. Wolfson
and Mr. Bruno had "prolonged, pronounced, substantive discussions
during that period of time." (Id. at 58.) In December 2002, the
Government moved unsuccessfully to revoke Mr. Wolfson's bail.

(Id. at 10.)  Mr. Wolfson was "absolutely" engaged in the process, appeared to understand the process, and was contributing to his defense. (Id.)

While Mr. Bruno had a concern over whether Mr. Wolfson was reviewing transcripts that were sent to him, Mr. Wolfson did eventually review the transcripts.  (Id. at 20-21.)  Based on his review of the evidence, at some point before trial Mr. Bruno concluded the case was a "loser."  (Id. at 45.)  Based on Mr. Bruno's advice, Mr. Wolfson authorized Mr. Bruno to seek a disposition.  (Id. at 47.)  Mr. Wolfson went "back and forth" about how negotiations were going.  (Id.)  Based on Mr. Wolfson's authorization, Mr. Bruno sought a "reverse proffer" from the Government.  (Id.)  Within minutes of leaving that meeting, Mr. Wolfson told Mr. Bruno "you have to work something out, we have to resolve this case."  (Id.)  Accordingly, Mr. Bruno approached the Government, requested a "Pimentel" letter, and began the negotiation process.  (Id. at 47-48.)  Mr. Wolfson was not happy with the Government's offer and disagreed with Mr. Bruno about how to counter.  (Id. at 48.)  After discussions went back and forth, Mr. Bruno and Mr. Wolfson had an intensive meeting in Central Islip.  (Id.)  Over forty-eight hours, they went through every piece of evidence on a grease board, discussing pros and cons, and how to address the case.  (Id.)  They agreed that the

case was "futile," and Mr. Wolfson then instructed Mr. Bruno to contact the Government to try to open up plea negotiations again. (Id.) The Government rejected this "eleventh-hour" attempt to resolve the case, and then Mr. Wolfson became "resigned" to his fate. (Id. at 48, 66.) Mr. Wolfson never disagreed about the futility of the case; he simply accepted that he did not have control over the negotiations. (Id. at 48.) While the defendant stresses that the defendant consulted a clairvoyant, the consultation does not indicate incompetence. The clairvoyant advised that Mr. Wolfson should not plead guilty but Mr. Wolfson authorized Mr. Bruno to attempt to obtain a plea. (Id. at 65-66.) Moreover, consultation with such advisers is hardly sufficient to support a finding of incompetence.

As trial approached, Mr. Wolfson continued to be "very engaged" on a "daily basis." (Id. at 11-12.) "He was running the ship in terms of ultimate defense decisions," on everything from retaining a defense expert to developing the defense strategy for addressing the Government's evidence to dealing with issues raised by the Government's Rule 404(b) motion. (Id. at 11.) Mr. Wolfson continued to be engaged once trial began. (Id. at 12.) He was "intimately involved" in jury selection, and was also involved in how the defense presented its case in opening statements. (Id.) During trial, Mr. Wolfson took detailed and

meticulous notes of the witnesses' testimony.  (Id.)  He also "recorded, in his own words, what he though the highlights of that witness testimony happened to be."  (Id.)  Mr. Wolfson and his counsel held nightly meetings during trial and went to dinner every night after trial to discuss upcoming witnesses. (Id.)  Mr. Wolfson was extremely instrumental in the cross-examination of key fact witnesses, and was "very involved" in the preparation of cross-examination of the Government's expert witnesses.  (Id.)  Mr. Wolfson was "absolutely" "fully engaged in handling the defense of his trial."  (Id.)

Mr. Wolfson continued to be engaged after trial, when the defense turned its attention to the pending Freedom Surf Indictment.  (Id. at 13.)  Mr. Bruno and Mr. Wolfson discussed "in depth various legal strategies and [Mr. Wolfson] was extremely involved" in deciding how to deal with the additional charges following his recent conviction.  (Id.)  As a result of these discussions, Mr. Wolfson authorized Mr. Bruno to approach the Government about possible cooperation, with an eye towards consolidating the cases against Mr. Wolfson to minimize his exposure.  (Id. at 14.)  This led to a "Kastigar session," in which Mr. Wolfson, Mr. Bruno, his partner and Government officials met in the United States Attorney's Office.  (Id.)  The meeting lasted for four or five hours, and throughout that

lengthy meeting Mr. Wolfson was "very coherent and very rational." (Id.)  At some point after this meeting, Mr. Wolfson pleaded guilty to the Freedom Surf Indictment.  (Id. at 15.)  At the time of Mr. Wolfson's guilty plea, Mr. Bruno had "absolutely" no concerns about Mr. Wolfson's competency to plead guilty and he appeared to be "absolutely" competent.  (Id.)

In the course of plea discussions after Mr. Wolfson's conviction on the Five Stock Indictment, Mr. Bruno asked the Government to consider a "carve-out" based on diminished mental capacity.  (Id. at 23.)  Mr. Bruno hoped to convince the Court that Mr. Wolfson had a "volitional impairment," because he continued to engage in risky conduct while on the Government's radar screen.  (Id. at 60-61.)  For the purposes of sentencing, Mr. Bruno retained Dr. Drob to examine Mr. Wolfson.  Mr. Bruno told Dr. Drob to "examine sanity, competency, and diminished capacity, no holds barred, do a complete and thorough examination on all those three issues so that he could make a comprehensive report." (Id. at 76.)  Following that examination, Mr. Bruno "wouldn't have asked for" a competency "hearing because [at] the time the report was generated" - March, 2004 - Dr. Drob told Mr. Bruno "that Mr. Wolfson was sane at the time he committed the offenses, competent at the time he committed the offenses, sane at the time he went to trial, competent at the

time he went . . . to trial, and that he was sane and competent at the time that [Dr. Drob] conducted the examination." (Id. at 27.)

Throughout Mr. Bruno's representation of Mr. Wolfson, Mr. Wolfson was "absolutely" engaged in his defense and able to converse with Mr. Bruno about the legal process in an apparently rational basis. (Id. at 15.) While Mr. Wolfson discussed his conspiracy theory regarding his prior criminal history in an early telephone call and in a meeting in Utah, when Mr. Bruno challenged him and noted the absurdity of the theory, Mr. Wolfson laughed it off and dropped the subject completely. (Id. at 16-17.) In fact, Mr. Wolfson responded by "dismissing the theory himself." (Id. at 38.)

There was never a point in his representation of Mr. Wolfson where Mr. Bruno was concerned that Mr. Wolfson might not be competent. (Id. at 17.) Mr. Bruno credibly summed up his own observations of Mr. Wolfson as follows:

> He was very competent. He was very engaged.
> He was very helpful. He was very focused.
> He had a great handle on all aspects of the
> process, and the evidence, and his business.

(Id. at 28.)

### B.

Dr. Drob, retained by the defendant, prepared two psychological evaluation reports, and testified before the Court

12

on October 1, 2007 at the competency hearing. Dr. Drob's first report, dated March 30, 2004, was prepared in connection with sentencing. That report was submitted to the Court in connection with an application by defense counsel for a downward departure under § 5K2.13 of the Sentencing Guidelines for significantly reduced mental capacity. (See Drob Report). The Report noted: "The results of psychological testing are indicative of mood instability, a serious thinking disturbance, clinically significant anxiety and Posttraumatic symptoms, in the context of a highly dysfunctional personality structure with Narcissistic Depressive, Dependent, Negativistic (Passive-Aggressive), and Avoidant Personality Features." (Drob Report at 14.) The Report also detailed a family history of mental illness. The Report noted certain alleged delusions that Mr. Wolfson suffered from including his claims that a prior conviction was the result of a government conspiracy with organized crime that involved the CIA, Presidents of the United States, and the National Football League. (Drob Report at 15.) The Report concluded: "The evidence points to a Bipolar I Disorder with lengthy manic episodes and delusional thinking with paranoid and perhaps grandiose delusions. Mr. Wolfson's delusions are in all likelihood secondary to or associated with a Bipolar I Disorder." (Drob Report at 16.)

However, after interviewing Mr. Wolfson extensively, and after subjecting Mr. Wolfson to a battery of psychological tests, Dr. Drob had no doubt that Mr. Wolfson was sane at the time of the offenses: "There can be little doubt that his was a sophisticated scheme to deceive potential investors and profit at their expense.  There can be no doubt that he understood the nature of this scheme and that he intentionally entered into it.  Further, my review of a portion of the tapes regarding his offense conduct indicates that he knowingly entered into the arrangements for which he was convicted." (Drob Report at 16.)  The Report did not conclude that Mr. Wolfson was incompetent at the time of trial or incompetent to be sentenced, nor did it recommend that those issues be pursued.  Rather, it concluded that Mr. Wolfson should be afforded some mitigation of any sentence: "It is thus my opinion that Mr. Wolfson's mental illness contributed to his offensive conduct and compromised both his cognitive (thinking and judgment) and volition (behavioral control) in connection with his offense. (Drob Report at 17.)

On September 18, 2006, Dr. Drob completed an "Addendum" to his report at the request of Mr. Wolfson's new counsel.  Dr. Drob completed this report after additional interviews of Mr. Wolfson, and additional psychological testing.  Dr. Drob also

interviewed Avi Moskowitz, a lawyer who had originally represented Mr. Wolfson, and Christopher Bruno, the lawyer who replaced Mr. Moskowitz and represented Mr. Wolfson at his trial and guilty plea. Dr. Drob concluded: "I have not found sufficient evidence to conclude that Mr. Wolfson was not competent to proceed with his case under the Dusky standard when he went to trial in 2003." (See Ex. F to Govt. letter dated Sept. 24, 2007, September 18, 2006 Addendum to Forensic Psychological Evaluation of Dr. Drob ("Drob Addendum"), at 28.)[2] Dr. Drob noted Mr. Wolfson's delusions and concluded, "There is no evidence on psychological testing that Mr. Wolfson is malingering or exaggerating his psychological symptoms (i.e. his frank delusions)." (Id. at 26.) Dr. Drob also found: "I do not have psychological evidence that this aspect of his illness was so severe as to make him incapable of understanding the proceedings or assisting counsel in his defense." (Id. at 28.) Dr. Drob further found that whatever delusions Mr. Wolfson may have had "did not seem to play a significant role in his thinking

---

[2] In an initial "Draft" of this same report that was provided to the Court and the Government, Dr. Drob stated his opinion even more directly, saying that Mr. Wolfson's mental disorders did not, "on [his] understanding of the law, render [Mr. Wolfson] incompetent under the Dusky standard." (See Drob Addendum at 18.) Dr. Drob testified that he modified this language after conversations with defense counsel. (Drob Tr. at 32.)

about his case, especially prior to and during trial," and that
"it was only after his conviction that Wolfson's paranoia
extended to the current case." (Id. at 27.) Dr. Drob had "seen
no evidence to suggest that [Wolfson] was delusional about the
current matter at that time." (Id. at 27.)

Nevertheless, Dr. Drob stated that there is "reason to
question Mr. Wolfson's current competency to be sentenced" based
on what Dr. Drob concluded were delusions arising from mental
illness. (Id. at 29.) According to Dr. Drob:

> On the assumption that the same Dusky standard
> regarding the capacity to assist counsel applies
> at the time of sentencing as it does at trial,
> there is also reason to question Mr. Wolfson's
> current competency to be sentenced. On the one
> hand, I believe that Mr. Wolfson understands what
> crime he stands convicted of, understands the
> sentencing range that might be imposed,
> understands that counsel is making motions for a
> more lenient sentence based on his physical and
> mental health, and understands that his attorney
> plans to file an appeal on his behalf. However,
> as his most recent letter to counsel (received
> September 7) suggests, he is very much focused
> upon factors in his case that his attorneys
> regard as irrelevant, and asks his attorney to
> call various witnesses to a hearing in order to
> prove how he has been conspired against.

It is true that despite having some odd notions about what his appeal might entail, Mr. Wolfson has cooperated with current counsel and appears to trust Mr. Cohen sufficiently to continue to be represented by him. However, his mental illness prevents him from consistently and adequately focusing upon the genuine issues in his current legal situation, genuinely acknowledging any wrongdoing on his part, and further interferes with his capacity to make a statement to the court that would be effective in mitigating his sentence.

(Id.)

On October 1, 2007, Dr. Drob testified at the competency hearing and explained his opinions and their basis. During his interviews of Mr. Wolfson over the years, Dr. Drob asked Mr. Wolfson to provide detailed information about his family; discussed legal issues with Mr. Wolfson, including complex issues regarding fiduciary duties; discussed motions that defense counsel filed on Mr. Wolfson's behalf; and explained to Mr. Wolfson that the mental health issues might help him with sentencing. (Drob Tr. at 55-56.) On all of these topics, Dr. Drob was able to communicate with Mr. Wolfson and Mr. Wolfson was able to speak about those issues, sound coherent and detailed, and grasp those issues. (Id. at 56.) Dr. Drob also discussed with Mr. Wolfson the plea negotiations before his trial and why he turned them down. (Id. at 56-57.) Again, with regard to each of these topics, Mr. Wolfson was able to discuss them with Dr. Drob in a "normal matter." (Id. at 57.) In fact, with regard to his criminal history, Mr. Wolfson perceptively

told Dr. Drob that because of his prior felony conviction it would be more difficult for him to testify in future proceedings because he could be cross-examined about that conviction. (Id. at 57-58.)

During the interviews of Mr. Wolfson in 2004, his responses were "all appropriate to the context," "his expressed emotion was appropriate to content," and "there was no evidence of hallucinations." (Id. at 58-60.) While his speech was mildly pressured, he was not in a manic state when Dr. Drob examined him, and Dr. Drob has never observed him in such a state. (Id. at 59.) During the interviews in 2004, Mr. Wolfson did not claim that his case was fixed, and he was able to describe accurately the conduct that he committed in a way that was understandable to Dr. Drob. (Id. at 61.) Mr. Wolfson "did not appear delusional about the facts of his case." (Id. at 62.)

Mr. Wolfson was similarly responsive and conversant during the more recent interviews in 2006 and 2007. Mr. Wolfson understood the concept of time served and was able to discuss legal issues with Dr. Drob, including issues that went beyond what his counsel had raised, such as "Crawford" issues. (Id. at 97-98.) Mr. Wolfson also discussed FBI "302s," Mr. Bruno's cross-examinations of witnesses, Mr. Bruno's failure to object to certain testimony, and the difference "between paying brokers

and paying others." (Id. at 98-99.) Mr. Wolfson raised these issues on his own without suggestion from Dr. Drob. (Id. at 99.)

Mr. Wolfson was able to describe accurately the current motions pending before the Court and to discuss both the legal issues regarding fiduciary duties and the issues regarding his own competence. (Id. at 105.) While Mr. Wolfson continues to insist that he is innocent, the primary basis for this conclusion is that he does not believe he had a fiduciary duty to disclose his payments to brokers, the same reason that his lawyer has given the Court. (Id. at 108.)

As part of his evaluation of Mr. Wolfson in 2006, Dr. Drob observed Mr. Wolfson's interaction with James Cohen, his current counsel, who is also a law school professor. (Id. at 99-100.) Mr. Wolfson appeared to have a full understanding of the concepts that his counsel discussed with him, and he was willing to follow his counsel's advice. (Id. at 100.) Mr. Wolfson trusts his counsel, and believes that because his counsel is "on salary" and "has students" that "makes him a more honest lawyer." (Id. at 101.) Dr. Drob observed times in which Mr. Wolfson raised an issue that his counsel explained "wasn't going to work here." (Id.) In those instances, Mr. Wolfson appeared to "digest what Mr. Cohen said, and then appeared to be humbled

by it." (Id.) When challenged by his attorney about his guilt, Mr. Wolfson did not express any delusions or conspiracy theories; he expressed his opinion that "it was not morally wrong." (Id. at 112.)

Based on his initial examinations in 2004, Dr. Drob concluded that Mr. Wolfson suffered from "mood instability, a serious thinking disorder, clinically significant anxiety and post-traumatic symptoms in the context of a highly dysfunctional personality structure with narcissistic depressive dependent negativistic - that is passive aggressive - and avoidant personality features." (Drob Report at 14; Drob Tr. at 9.) Now, however, he believes that Mr. Wolfson's primary diagnosis is delusional disorder, an Axis I condition in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") IV. (Drob Tr. at 17, 19.)

Dr. Drob found that Mr. Wolfson had suffered, and continues to suffer, from delusions, meaning fixed false beliefs. (Id. at 17.) Dr. Drob hypothesized that Mr. Wolfson's ability to make an informed and reasonable decision about how to go to trial may have been compromised by his mental illness and by mental disorders. (Id. at 27.) He conceded, however, that Mr. Wolfson "also evidenced a capacity to understand the nature and

consequences of the actions against him." (Id. at 27-28.)  In
this respect:

> He understands the proceedings.  He
> understands the facts that have been
> presented to him by his counsel.  And while
> at times, particularly more recently, he's
> been irrational in his demands on how to
> proceed with his case, for the most part . .
> . his reasoning problems have not grossly
> interfered with his understanding of the
> nature of the charges against him.

(Id. at 28.)

Based on his thorough evaluation of Mr. Wolfson in 2004 -
shortly after Mr. Wolfson pleaded guilty to the Freedom Surf
Indictment - Dr. Drob "did not make any finding that [Mr.
Wolfson] was incompetent to stand trial or to plead guilty."
(Id. at 64.)  Had he believed that Mr. Wolfson was incompetent
at that time, Dr. Drob testified he would have put that in his
report and shared it with his then counsel. (Id.)  Instead, Dr.
Drob concluded that Mr. Wolfson did not show "any of what [he]
thought to be the hallmarks of an incompetent defendant."  (Id.)

Dr. Drob also testified about the second report he
prepared, in 2006. He provided defense counsel with a draft of
that report, and then made certain revisions before finalizing
it.  (Drob Addendum at 30-31, 65-68.)  Dr. Drob initially noted
that, at the time of his convictions, Mr. Wolfson "was
competent; that there wasn't evidence that he was not competent

during that period." (Id. at 32.)  After receiving this report, defense counsel asked Dr. Drob to make certain assumptions. (Id. at 32, 68.)  Based on defense counsel's input, Dr. Drob decided to change his report to say that "there isn't sufficient evidence for me to render a finding of incompetency during that period." (Id. at 32.)

Even after consulting with current counsel, Dr. Drob failed to find evidence that Mr. Wolfson had been incompetent at the time of his trial or his guilty plea.  Indeed, in his hearing testimony, Dr. Drob conceded that someone like Mr. Wolfson who was suffering from a delusional disorder could have periods of lucidity.  (Id. at 39.)  In this respect, whatever delusions Mr. Wolfson may have had while he was represented by Mr. Bruno, "hadn't really infected his view of the case to such a degree or to a significant degree so that he was able to consult with Mr. Bruno, with the experts that Mr. Bruno hired, and go over the material in a lucid, rational way."  (Id. at 39-40.)  Dr. Drob explained that such "delusions were less likely to have an impact, a specific impact upon his reasoning about the then current case."  (Id. at 48.)  Simply put, Mr. Wolfson's "condition" "wasn't so bad back then," and he was not "delusional about his case."  (Id. at 72.)

Moreover, the mere fact that Mr. Wolfson decided not to plead guilty before his trial did not show that he had a mental illness, that he had any delusions, that he had poor reasoning ability, or that he was acting irrationally. (Id. at 48-49.) Mr. Wolfson had a very rational reason for not pleading guilty. He reportedly decided that the sentence he would receive if he pleaded guilty would not be materially different from the sentence he would receive if he lost after trial; the sentences he would receive would have the same impact on his life. (Id. at 49-50.)

With respect to his competency to be sentenced, Dr. Drob stated that whether or not Mr. Wolfson was competent turned on the standard to be applied by the Court. (Id. at 35.) On the one hand, if Mr. Wolfson were to go to trial today, Dr. Drob believes that he would not meet the Dusky standard for competence. (Id. at 33.) This is because, unlike in 2004, Mr. Wolfson's delusions are now infecting his current case; Mr. Wolfson believes that his conviction is in part the result of a conspiracy against him. (Id. at 33, 36.) On the other hand, now that trial is over, it is unclear what functions Mr. Wolfson needs to perform for sentencing. (Id. at 34.) Mr. Wolfson might have difficulty if he were asked to make a statement to the Court, although he understands the legal arguments related

to his case and recognizes that people might think he was crazy if he told his conspiracy theories to the Court. (Id. at 34-35.)  As a result, Mr. Wolfson has said that "he would refrain from doing so."  (Id. at 35.)  Dr Drob explained: "I think that his inability to understand that he had done wrong, that there was wrongdoing involved in what he did is, in some ways, conditioned by that denial that is a hallmark of his mental illness.  And so he might be somewhat compromised in making a statement to the Judge, even though he says that he would not get into all the delusional material." (Id. at 35.)

Dr. Drob acknowledged that the things you need to do to be sentenced may be much less than what you need to do to stand trial.  (Id. at 112.)  In this respect, Mr. Wolfson is fully competent with respect to numerous aspects of sentencing.  He is aware of the details of the sentencing process and is able to assist his attorney in developing information for sentencing. (Id. at 112-14.)  Mr. Wolfson understands that he is currently in jail, he understands that "if he's sentenced to jail, he's going to do time in prison," and he is rational enough to know that he does not want to be in jail.  (Id. at 116.)

The only "functional" concern that Dr. Drob has about Mr. Wolfson's competency to be sentenced is "whether he'll be able to,

when the time comes, stand up and talk to the Court, as is his right, and make a statement."  (Id. at 116.)

## C.

Dr. Wilfred G. Van Gorp, a neuropsychologist at Columbia University, evaluated Mr. Wolfson at defense counsel's request twice in August, 2006, and testified at the competency hearing on October 1, 2007.  (Van Gorp Tr. at 173.)  As part of his evaluation, Dr. Van Gorp administered a "battery" of neuropsychological tests.  (Id. at 176.)  These tests provide a snapshot of Mr. Wolfson's mental functioning during the particular time period in which they were administered.  (Id. at 208.)  Dr. Van Gorp did not offer any opinion as to Mr. Wolfson's brain functioning during the periods in which he was committing his offense, going to trial, or pleading guilty.  (Id. at 209.) Nor was Dr. Van Gorp describing Mr. Wolfson's current functioning, since there could have been changes in Mr. Wolfson's condition since August 2006 when Dr. Van Gorp tested him.  (Id.)

As a result of these tests, Dr. Van Gorp concluded that as of August 2006 Mr. Wolfson had a "neuro-cognitive disorder" and that Mr. Wolfson's left temporal frontal region was "compromised." (Id. at 207.)  Dr. Van Gorp likened this result to a stress test that reveals that someone might have cardiac damage.  Id.  As

with such a stress test, "you have to do further studies to really refine that." (Id.) Dr. Van Gorp had neither done such further studies nor been asked to do such studies in this case. (Id. at 219-20.)


**D.**

Stuart B. Kleinman, M.D., a forensic psychiatrist who specializes in forensic psychiatry and traumatic stress was retained by the Government. He prepared a comprehensive 124-page report concerning Mr. Wolfson's competence dated June 15, 2007. (See Forensic Psychiatric Report of Dr. Kleinman dated June 15, 2007 ("Kleinman Report").)

Dr. Kleinman concluded credibly that Mr. Wolfson was competent to stand trial and plead guilty, but Dr. Kleinman did not give an unqualified opinion that Mr. Wolfson was competent to be sentenced. (Kleinman Report at 118-20.) Dr. Kleinman concluded:

> Mr. Wolfson possesses: 1) a Mood Disorder Not Otherwise
> Specified, which produces non-psychotic, mood fluctuations
> – primarily limited mood elevations, and 2) a Personality
> Disorder Not Otherwise Specified with Narcissistic,
> Borderline, Paranoid, and Schizotypal features. The
> idiosyncratic, paranoid – overvalued – ideas which are a
> component of the latter condition are particularly
> important to whether he is competent to participate in
> relevant legal proceedings. . . .Mr. Wolfson rationally
> understood legal proceedings, and to a large extent was
> rationally able to assist in his defense. His mental state
> did not significantly impair his ability to participate in

26

relevant legal proceedings. . . Mr. Wolfson was competent
to stand trial.  (Id. at 118.)
    Dr. Kleinman also noted that Mr. Wolfson had explained that

Mr. Wolfson pleaded guilty in 2004 to the Freedom Surf

Indictment because he believed that he was guilty.  Dr. Kleinman

noted that Mr. Wolfson followed the advice of Mr. Bruno so that

he would have the opportunity for a concurrent sentence with the

sentence in the Five Stock Indictment case.  Moreover, Dr.

Kleinman pointed out that Mr. Wolfson pleaded guilty for a

rational reason and his plea reflected that he was neither

paranoically unable to work cooperatively with his attorney or

unable rationally to consider his legal situation. (Id. at 94.)

    With regard to sentencing, Dr. Kleinman forthrightly did

not offer a definitive opinion as to whether Mr. Wolfson was

competent to be sentenced.  He noted that Mr. Wolfson's paranoid

delusions had gotten worse after the trial and guilty plea. (Id.

at 97-99.)  The paranoid delusions included a conspiracy among

President Bush, the FBI, the IRS, the judiciary, the CIA, the

Mob and the NFL which resulted in an earlier conviction.  (Id.

at 98.)  His conspiracy theory extended to his trial in the Five

Stock case and he believed that the Government prosecutor and

his defense attorney were part of the conspiracy against him.

(Id. at 101-02.)   Dr. Kleinman concluded:

    Mr. Wolfson – assuming he has not successfully malingered,
    i.e., fooled the evaluator into finding that his current

psychiatric condition is more severe than it, in fact is –
has since approximately the summer of 2005 had greater
psychiatric difficulties than he did around the time he was
tried in 2003.  His longstanding paranoid ideas have been
more intense – and in limited ways approached delusional
magnitude, especially regarding Mr. Bruno and his
relationship with [the government prosecutor] and the
Government's motivation for prosecuting him in this matter.

(Id. at 119.) Dr. Kleinman pointed out that Mr. Wolfson's

psychiatric difficulties:

> [D]o not globally diminish his functioning. . . .[T]he
> impact of his disturbance upon his ability to participate
> in his sentencing proceeding is limited in important ways.
> He distortedly regards the motivation for his prosecution
> -- but to a significant extent understands: 1. What is a
> sentencing proceeding; 2. For what actions he is to be
> sentenced; 3. What range of time he is at significant risk
> of being sentenced to serve in prison; 4. The roles
> involved in a sentencing proceeding."

(Id.)  Dr. Kleinman also noted that Mr. Wolfson is able to work

cooperatively with Mr. Cohen, his current attorney. (Id.)

Further, Dr. Kleinman noted that Mr. Wolfson "is both disturbed

– and able to rationally participate in central components of

his sentencing proceeding." (Id.)

Unlike his unqualified conclusions with respect to Mr.

Wolfson's competence to stand trial and plead guilty, Dr.

Kleinman candidly did not offer a final opinion that Mr. Wolfson

was competent to be sentenced: "If the above described degree to

which Mr. Wolfson is rationally able to assist regarding his

sentencing is legally sufficient to be considered a 'reasonable degree', he is competent to be sentenced." (Id. at 120.)

Dr. Kleinman testified at the competency hearing on October 2, 2007 and credibly explained the bases for his opinions. Dr. Kleinman interviewed Mr. Wolfson and various third parties, administered psychological tests, reviewed Dr. Drob's work and reviewed significant amounts of the trial evidence including transcripts of recorded conversations with Mr. Wolfson. (Kleinman Tr. at 252-56.) Dr. Kleinman considered Mr. Wolfson's mental state at several points in time to complete his report. (Id. at 256.)

Based on his examination and review of all relevant materials, Dr. Kleinman concluded, credibly and persuasively, to a reasonable degree of medical certainty, that Mr. Wolfson was clearly competent to stand trial in 2003 and clearly competent to plead guilty in 2004. (Id. at 266.)

While the defendant attempts to argue that Mr. Wolfson's vacillation in his decision whether to plead guilty in the Five Stock Indictment case, is an indication of mental incompetence, Dr. Kleinman credibly rejected the argument. Dr. Kleinman carefully considered the plea discussions leading up to Mr. Wolfson's trial before concluding that Mr. Wolfson was competent at that time. (Id. at 287-88.) Dr. Kleinman noted that several

29

factors in these discussions showed that Mr. Wolfson was competent and acting rationally at this time. (Id. at 288-92.) The fact that Mr. Wolfson ultimately went to trial - despite the strong case against him - did not show that Mr. Wolfson was unable to make a rational decision; on the contrary, Mr. Wolfson simply concluded that the difference in the sentence he would receive if he went to trial and lost was not significantly different from what he would receive if he pleaded guilty. (Id. at 291.) Under these circumstances, Mr. Wolfson decided he was going to save "face," act "as a man," and "go forward with the case." (Id.) While this was perhaps not a good decision, it was not the result of psychosis. (Id.) In this respect, the fact that Mr. Wolfson ultimately did plead guilty to the Freedom Surf Indictment supports the conclusion that he was able to make a rational decision after consultation with his then-counsel. (Id. at 291-92.) Thus, nothing about the plea discussions suggested that Mr. Wolfson was incompetent to stand trial. (Id. at 292.)

Dr. Kleinman believes that Mr. Wolfson's mental state has deteriorated since 2004, and that he currently "possesses genuine psychiatric difficulties." (Id. at 267.) This does not, however, necessarily mean that he is currently incompetent. (See Kleinman Report at 9.) As Dr. Kleinman explained:

> [A]n individual can be mentally ill,
> including severely mentally ill and be
> competent, because the issue of competency
> is not . . . based solely upon the presence
> of a mental disorder, it's specifically on
> the relationship of that mental disorder to
> the individual's ability to perform
> particular tasks, the nature of the tasks
> being in part determined by the nature of
> the specific matter.

(Kleinman Tr. at 268.)

At the competency hearing, Dr. Kleinman provided a two-part diagnosis of Mr. Wolfson's current mental condition. First, he suffers from a "long standing relatively mild mood disorder," which Dr. Kleinman diagnosed as a mood disorder not otherwise specified. (Id. at 267.) This condition is not something that in any meaningful way affects "his understanding of [or] ability to participate in [the] current legal proceedings." (Id.) Second, Mr. Wolfson has "a predilection to view things [], at times, in an idiosyncratic kind of way." (Id. at 268.) This condition is magnified by Mr. Wolfson's current pressures to "almost delusional intensity." (Id.) This latter condition makes Dr. Kleinman's evaluation of Mr. Wolfson's current mental capacity - as opposed to his capacity in 2003 and 2004 - "more complicated." (Id. at 269.) Dr. Kleinman described Mr. Wolfson's mental illness as a personality disorder not otherwise specified, with significant narcissistic borderline paranoid and schizotypal features. (Id. at 307.) Dr. Kleinman explained that

the paranoid and schizotypal components of the personality disorder are particularly relevant to Mr. Wolfson's current disturbance, and have intensified in magnitude, and now affect the way in which he perceives the proceedings against him. (Id. at 307.) In particular, Mr. Wolfson believes that the criminal proceedings against him are motivated by a vast conspiracy which is an attempt to silence him about what he knows about the conspiracy. (Id. at 301-03.) Dr. Kleinman testified credibly that Mr. Wolfson genuinely holds this belief and agreed with the characterization of that belief as "sick." (Id. at 301.)

Notwithstanding his delusions, Mr. Wolfson is able to understand the nature of the sentencing proceedings, the specific legal issues involved in his case, and the roles of each of the participants; he is able to coherently discuss the "events that underlie his conviction, the acts in which he was involved and the methodology involving those acts"; and he is able to discuss his background, including his family history. (Id. at 270-71, 299-300.) As a result, Dr. Kleinman believes that Mr. Wolfson "possesses significant psychological ability as it relates to his current legal situation." (Id. at 271.)

However, Dr. Kleinman did not opine that Mr. Wolfson was competent to be sentenced. While Dr. Kleinman set forth Mr. Wolfson's abilities to understand the proceedings and assist his

attorney to a "reasonable" extent, and to discuss coherently his actions and the legal theory his defense is putting forth, Dr. Kleinman candidly and credibly explained that Mr. Wolfson's competence was affected by his paranoia.  (Id. at 274.)  As a function of his paranoia, Mr. Wolfson believes that "the government is prosecuting him, that the motivation for the government prosecuting him is to keep him silent, to shut him up because he believes, Mr. Wolfson believes that the government knows that he – he understands what this purported conspiracy involving all these parties is, and the government does not want Mr. Wolfson to relay this information to the general public. . . ."  Mr. Wolfson believes the ultimate motivation for why everyone will be in court on the day he is sentenced relates to a conspiracy. (Id. at 275-76.)  This paranoia also affects one aspect of Mr. Wolfson's participation in the sentencing proceeding.  Dr. Kleinman testified that when called upon to speak at sentencing, Mr. Wolfson would "indicate that he has not committed a crime and, essentially, that this is part of the conspiracy against him, that such fabricated a crime, and that he, as a result, has nothing to apologize to the Court for." (Id. at 275-76.)  However, Mr. Wolfson would follow the Court's instructions as to any limits on time. (Id. at 276.)

Dr. Kleinman also testified that there are important limitations on Mr. Wolfson's delusions. (Id. at 293.) For example, notwithstanding his conspiracy theories, Mr. Wolfson believes that his conviction might be overturned based on the legal arguments put forth by his counsel. (Id. at 293-94, 296.) Mr. Wolfson is able to talk about these legal arguments, and his paranoia does not contaminate the way in which he views his chances of winning on those arguments. (Id. at 296.) Mr. Wolfson also believes that he could beat charges that are currently pending in Utah. (Id. at 294.) These beliefs show that Mr. Wolfson is focused on evidence and law, as opposed to some governmental conspiracy. (Id.) Significantly as well, Mr. Wolfson's paranoia does not extend to his current counsel, whom Mr. Wolfson trusts. (Id. at 294-95.) Nor does Mr. Wolfson's condition prevent him from discussing to "a meaningful extent . . . the actions that were the basis for his being charged and convicted." (Id. at 297.) Mr. Wolfson is aware that his counsel has raised an issue regarding his competency. (Id. at 298.) He does not agree with counsel's assessment of his competency, but believes that "it could be a fallback beneficial position to not be found competent." (Id.)

**E.**

There is nothing in Mr. Wolfson's courtroom appearances that supports a finding of incompetency. At his original trial, Mr. Wolfson was never disruptive and there was no suggestion of incompetence. At his guilty plea allocution to the Freedom Surf Indictment before Magistrate Judge Peck on January 21, 2004, which was eventually accepted by Judge Hellerstein, Mr. Bruno explained that, pursuant to this Court's order, Dr. Drob was performing a psychological evaluation of Mr. Wolfson. But Mr. Bruno assured the Court that there was nothing about that evaluation that should in any way impact on Mr. Wolfson's willingness or ability to enter into a plea allocution. (January 21, 2004 Tr. at 6.) Mr. Bruno assured the Court, without contradiction, that in his opinion Mr. Wolfson was pleading guilty knowingly and voluntarily. (Id. at 16.) Mr. Wolfson also explained the details of his criminal conduct and answered questions about it. (Id. at 18-21.) He admitted that his intent was to defraud investors, that he knew that what he did was wrong and illegal, and that the purpose was to enrich himself and others. (Id. at 20-21.) The Magistrate Judge found that Mr. Wolfson understood the nature of the charges and the consequences of pleading guilty, that he was pleading guilty

voluntarily and knowingly, and that there was an independent basis in fact for his plea. (Id. at 22.)

At the three days of competency hearings before this Court, Mr. Wolfson was always respectful and attentive, consulted with his lawyer, took notes, and was never disruptive.

## III.

By motion dated March 6, 2006, Mr. Wolfson moved by new counsel to vacate his guilty verdict returned on March 26, 2003 in the Five Stock Indictment case, and his guilty plea on January 21, 2004 in the Freedom Surf case. Mr. Wolfson argued that the jury instructions in the Five Stock Indictment case were improper. That argument, which is without merit, is rejected in a separate Order. Mr. Wolfson also argued that he was incompetent at the time of his trial and guilty plea.

Rule 33 states that the court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 "specifically contemplates that such motions may be made based on newly-discovered evidence." United States v. Siddigi, 959 F.2d 1167, 173 (2d Cir. 1992). "Relief is justified under Rule 33 if the defendant makes a showing that the evidence is in fact new', i.e., it could not have been discovered, exercising due diligence, before or during

trial, and that the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" Id. (quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)).

A district court "has 'broad discretion' to decide Rule 33 motions based upon its evaluation of the proof produced... because, having presided over the trial, it is in a better position to decide what effect the newly discovered materials might have had on the jury." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995) (citations omitted). Nevertheless, "a district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances*." United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993) (emphasis in original)(internal quotation marks and citation omitted); see also United States v. Brodwin, 292 F. Supp. 2d at 484, 492-93 (S.D.N.Y. 2003).

The defendant argues that the evidence of the defendant's incompetence is "newly discovered" and that, in any event, even if that evidence is not newly discovered, the failure of his trial counsel to raise that issue shows ineffective assistance of counsel which is newly discovered. A motion based upon newly discovered evidence must be brought within three years of the

verdict or finding of guilty.  See Fed. R. Cr. P. 33(b)(1).  The
motion was brought within that time limit.  The Government
argues, however, that the evidence is not newly discovered
because it could have been discovered with due diligence before
or during trial.  See United States v. Klein, No. 03 Cr. 813,
2007 WL 2274254, at *2 (S.D.N.Y. Aug. 7, 2007) (finding untimely
post-trial claim based on mental illness and rejecting argument
that such claim constitutes newly discovered evidence); cf.
Brodwin, 292 F. Supp. 2d at 493-95 (permitting new trial claim
based on allegation that co-conspirator was insane because
evidence of co-conspirator's mental state was "newly discovered"
in that defendant had no ability to obtain evidence of insanity
previously). At the very least, there is a strong argument that
the claim of ineffective assistance of trial counsel is based on
newly discovered evidence, and new counsel was only recently
appointed before bringing the motion.  In any event, the
government explicitly consented to a competency hearing relating
to the defendant's competence to stand trial and plead guilty,
and there is plainly no merit to those claims by the defendant.
Similarly, the claim of ineffectiveness of counsel to raise
those issues is plainly without merit.

The standard for determining whether a defendant is competent to stand trial or plead guilty is well settled. "The defendant must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" United States v. Nichols, 56 F.3d 403, 410 (2d Cir. 1995) (quoting Dusky v. United States, 362 U.S. 402 (1960) (per curiam)); United States v. Morrison, 153 F.3d 34, 46 (2d Cir. 1998); United States v. Hemsi, 901 F.2d 293, 295 (2d Cir. 1990); see also Godinez v. Moran, 509 U.S. 389, 396 (1993) (defendant is competent to plead guilty if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has a "rational as well as factual understanding of the proceedings").

The requirement that a defendant be competent at the time of his trial and guilty plea is rooted in the guarantee of due process for a defendant. See, e.g., Godinez, 509 U.S. at 402; Medina v. California, 505 U.S. 437, 448 (1992); United States v. Gigante, 996 F.Supp. 194, 197 (E.D.N.Y. 1998).

A district court's determination of competency is made on the basis of the preponderance of the evidence. United States

v. Morrison, 153 F.3d at 46; United States v. Nichols, 56 F.3d at 410 (citing 18 U.S.C. § 4241(d)).  In making this determination, the district court may properly rely on a number of factors, including medical opinion and the district court's observation of the defendant's comportment. Nichols, 56 F.3d at 411; United States v. Hemsi, 901 F.2d at 295-96; United States v. Oliver, 626 F.2d 254, 258-59 (2d Cir. 1980).  This standard has been explicitly included in the statute for a determination of competency prior to sentencing: "If, after the hearing, the court finds that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General." 18 U.S.C. § 4241(d).

The Supreme Court has noted that the burden of proof with respect to competence is on the defendant.  See Cooper v. Oklahoma, 517 U.S. 348, 362 (1996).  However, the allocation of the burden of proof is only relevant in those rare cases where the evidence is in equipoise. See United States v. Nichols, 56 F.3d 403, 410 (2d Cir. 1995).  This case does not turn on the allocation of the burden of proof because the evidence is not in equipoise.  The evidence clearly establishes the competence of

the defendant to stand trial and to plead guilty when those events occurred.

"It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986); accord Nichols, 56 F.3d at 412.  Rather, to support a finding of incompetency, "[t]he mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." Nichols, 56 F.3d at 412 (quoting United States v. Dusky, 362 U.S. at 402).

**B.**

Mr. Wolfson was clearly competent to stand trial in 2003 and competent to plead guilty in early 2004.  Both Dr. Drob and Dr. Kleinman agree on this point, and their conclusions are amply supported by the extensive testimony of Mr. Bruno; the record in this case, and the Court's own observations of Mr. Wolfson before, during, and after trial.

Dr. Drob, who examined Mr. Wolfson shortly after Mr. Wolfson pleaded guilty in 2004, found that Mr. Wolfson did not show "any of what [he] thought to be the hallmarks of an incompetent defendant."  (Drob Tr. at 64.)  As a result, Dr. Drob

told Mr. Wolfson's then-counsel in 2004 that Mr. Wolfson "was sane at the time he committed the offenses, competent at the time he committed the offenses, sane at the time he went to trial, competent at the time he went . . . to trial, and that he was sane and competent at the time that [Dr. Drob] conduced the examination." (Bruno Tr. at 27, 53.) Dr. Drob reiterated this conclusion in his draft addendum in 2006, and testified that he concluded that Mr. Wolfson "was competent; that there wasn't evidence that he was not competent during that period." (Drob Tr. at 32.) Even after defense counsel asked Dr. Drob to assume that Mr. Wolfson had a mental illness at the time of his trial and that this illness affected his decision-making abilities, Dr. Drob still concluded that "there isn't sufficient evidence for me to render a finding of incompetency during that period." (Id.) Dr. Drob reached this conclusion based on all the materials he reviewed and his own interactions with Mr. Wolfson. During interviews with Mr. Wolfson in 2004, shortly after Mr. Wolfson's guilty plea to the Freedom Surf Indictment, Dr. Drob found Mr. Wolfson to be expressive, logical thinking, goal directed, coherent, and appropriate. (Id. at 58-60.) Significantly, Mr. Wolfson was able to describe accurately the conduct that he had been convicted of, and he was not delusional about the facts of his case. (Id. at 61-62.) As Dr. Drob put

it at the hearing, Mr. Wolfson's condition simply "wasn't so bad back then," and he "wasn't delusional about his case." (Id. at 72.) At the time he submitted his initial report in 2004 in connection with the application for a downward departure at sentencing, Dr. Drob did not conclude that Mr. Wolfson was incompetent to stand trial or plead guilty, and if Dr. Drob had believed Mr. Wolfson were incompetent, he certainly would have included that in his report. (Id. at 64.)

Dr. Kleinman concluded credibly that Mr. Wolfson was "clearly competent" to stand trial in 2003 and "clearly competent" to plead guilty in 2004. (Kleinman Tr. at 266.) Dr. Kleinman based this conclusion on all of the evidence he had reviewed, including portions of the trial transcripts, conversations with "collateral" witnesses, Mr. Bruno's testimony, and the trial evidence. Dr. Kleinman expressed no hesitation whatsoever about his opinion as to Mr. Wolfson's competency to stand trial and plead guilty. He detailed all the reasons why Mr. Wolfson was competent in his lengthy expert report. (See Kleinman Report at 9-94.)

Mr. Bruno's credible testimony also strongly supports the conclusion that Mr. Wolfson was competent to stand trial and plead guilty. His testimony shows that Mr. Wolfson had the ability to consult with his lawyer with a reasonable degree of

rational understanding and that Mr. Wolfson did in fact do so.

Moreover, the testimony shows that Mr. Wolfson had a rational as

well as factual understanding of the proceedings against him.

Mr. Bruno spent extensive time with Mr. Wolfson during the

relevant time period. Yet Mr. Bruno never had any concern about

Mr. Wolfson's competency. Mr. Wolfson was fully engaged,

entirely rational, and actively involved in all aspects of his

case. Since competency involves only "sufficient present

ability to consult with [one's] lawyer with a reasonable degree

of rational understanding" and "a rational as well as factual

understanding of the proceedings," Nichols, 56 F.3d at 410,

failure by trial counsel to indicate the presence of such

difficulties provides "substantial evidence" of the defendant's

competence. See United States v. Kirsh, 54 F.3d 1062, 1071 (2d

Cir. 1995).

Here, Mr. Wolfson not only meaningfully participated in his

own defense, but according to Mr. Bruno, he "ran the ship" in

terms of strategic decisions. During trial Mr. Wolfson was

involved in everything from jury selection to preparing to

cross-examine Government witnesses. Mr. Wolfson took meticulous

notes of witness testimony and helped Mr. Bruno to develop a

defense around a transcript that Mr. Wolfson identified. He

continued to be actively involved in defense strategy after the

guilty verdict, first attempting to cooperate and then agreeing to plead guilty to the Freedom Surf Indictment to minimize his sentencing exposure. On several occasions - during a reverse proffer, during jury selection, during the lengthy jury trial, during the "Kastigar" session, during his guilty plea - Mr. Wolfson was in a position where he could have exhibited some form of mental illness or delusions if he were incompetent. Yet in each of these settings, and throughout the proceedings, Mr. Wolfson remained engaged, appropriate, and attentive.

The defendant relies on Mr. Wolfson's vacillation as to whether to accept a guilty plea in the Five Stock Indictment case to demonstrate incompetence. The argument appears to be that the evidence was so strong that the defendant should have pleaded guilty in that case. This is somewhat inconsistent with the defendant's motion to vacate the guilty verdict on the grounds that the jury charge was allegedly defective. It is also inconsistent with the defendant's argument that the defendant was incompetent when he pleaded guilty to the Freedom Surf Indictment about nine months after the guilty verdict in the Five Stock Indictment case. In any event, vacillation on whether to accept a guilty plea, particularly for a defendant who protests his innocence as a matter of law, does not establish incompetence. Moreover, Mr. Wolfson did authorize his

counsel to attempt to negotiate a guilty plea, but the
Government was not prepared to offer a significantly beneficial
plea agreement.  There were rational reasons for Mr. Wolfson to
reject any such offer because he could reasonably have concluded
that the sentence he would receive after such a plea would not
have helped him materially given his age and physical condition.

The Court's own observations of Mr. Wolfson before, during
and after trial corroborate Mr. Bruno's testimony and the
conclusions of the psychiatric experts.  There was never any
issue raised by the Court or by the Magistrate Judge who took
Mr. Wolfson guilty plea in the Freedom Surf Indictment case or
by any of the participants as to Mr. Wolfson's competency either
to stand trial or to plead guilty.

In short, Mr. Wolfson was clearly competent to stand trial
in the Five Stock Indictment case and to plead guilty to the
Freedom Surf Indictment.  At both times he had the sufficient
present ability to consult with his lawyer with a reasonable
degree of rational understanding and he had a rational as well
as factual understanding of the proceedings against him.  The
motion to vacate the guilty verdict and the guilty plea is
denied.

## IV.

The defendant also moves to vacate the guilty verdict and the guilty plea on the grounds that his lawyer at the time of those proceedings was ineffective for failing to raise the issue of incompetency at the time.

To establish a claim of ineffective assistance of counsel, the petitioner must show that: (1) his counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time, and (2) that his counsel's deficient performance was prejudicial to his case. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Bunkley v. Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995).

The petitioner cannot meet the first prong of this test merely by showing that his counsel employed poor strategy or made a wrong decision. Instead, the defendant must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." See Strickland, 466 U.S. at 687. In fact, there is a "strong presumption" that defense counsel's conduct fell within the broad spectrum of reasonable professional assistance, and a defendant bears the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."

47

Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (citing Strickland, 466 U.S. at 688-89).

To meet the second prong of the Strickland test, the petitioner must show that "[t]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Ramos v. United States, No. 97 Civ. 2572, 1998 WL 230935, at *3 (S.D.N.Y. May 8, 1998).

Where a defendant challenges a guilty plea on the basis of alleged ineffective assistance of counsel, the defendant must show that, but for counsel's error, there is a reasonable probability that he would not have pleaded guilty. Hill v. Lockhart, 474 U.S. 52, 59 (1985); Tate v. Wood, 963 F.2d 20, 23-24 (2d Cir. 1992).

There is plainly no merit to the argument that the defendant's counsel at the time of the Five Stock Indictment trial and the Freedom Surf Indictment guilty plea was ineffective. There was nothing objectively unreasonable in the defense counsel's failure to raise a claim of incompetence to stand trial or plead guilty. For the reasons explained above, there would have been no merit to any such claim. Indeed, when

Dr. Drob was retained by Mr. Wolfson's counsel at the time to conduct a psychological evaluation for purposes of sentencing, Dr. Drob did not raise any question as to Mr. Wolfson's competency at that time. It was certainly not objectively unreasonable for Mr. Wolfson's counsel not to raise that issue.

Moreover, it is plain that there was no prejudice from trial counsel's failure to raise the issue because it would not have changed the result in any way. Any such application would have been rejected on the merits.

Therefore, the defendant's motion to vacate the guilty verdict in the Five Stock Indictment case and the guilty plea in the Freedom Surf Indictment case is denied.

### V.

### A.

The Supreme Court has not addressed the issue of whether the Dusky standard of competency applies to sentencing. In a thorough opinion, Judge Weinstein concluded that the Dusky standard should apply to the determination of competence at the time of sentencing. See Gigante, 996 F. Supp. at 198. This is consistent with decisions from the Court of Appeals for the Second Circuit which appear to have approved the use of the

Dusky standard at sentencing.  See, e.g., Nichols, 56 F.3d 410-13; Wojtowicz, 550 F3d 786, 790, 793 (2d Cir. 1977).

The Dusky standard is rooted in the guarantee of due process for a defendant, and the defendant is entitled to due process at the sentencing hearing as well as during the entire criminal proceeding against him.  Gigante, 996 F. Supp. at 197. The Dusky standard is well suited to being applied to the sentencing proceeding precisely because it is a flexible standard that is geared to the requirements of providing due process to the defendant at each step of the criminal process. The standard requires that the defendant have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, as well as a rational and a factual understanding of the proceedings. Dusky, 362 US at 402. A defendant must be able meaningfully to consult with his lawyer in connection with the specific proceeding at issue. The defendant must also have a rational understanding of the proceeding, and that includes an understanding of why he is being punished. Gigante, 996 F. Supp. at 198.

The tasks required for the defendant and his attorney at sentencing are different from those required at trial, and competence must therefore be focused on the tasks to be accomplished at sentencing and whether the defendant can

meaningfully assist the defendant's attorney with those tasks and meaningfully make the decisions that must be made in connection with sentencing, including the decisions as to whether the defendant should speak at sentencing, and if so, what the defendant should say at sentencing. Both Dr. Drob and Dr. Kleinman - experts in forensic psychology and psychiatry, respectively - recognize this distinction between the assistance to be provided by a defendant at sentencing as compared to trial. (See Drob Tr. at 34, 112; Kleinman Tr. at 272.)  The defendant is not required to speak at sentencing, and may choose not to do so.  But it would offend due process to deny a defendant, because of the defendant's mental illness over which he has no control, the opportunity to choose whether to speak at sentencing and, if he chooses to speak, what he should say at sentencing to attempt to mitigate the sentence to be imposed. See Fed. R. Cr. P. 32(i)(4)(A)(ii) ("Before imposing sentence, the court must: . . .(ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence.").

It is particularly important at sentencing that the defendant have a rational as well as factual understanding of the proceedings which includes an understanding of why he is being punished.  This is so because the sentence must be

sufficient but no greater than necessary to accomplish the
purposes of sentencing including the need for the sentence
imposed to "provide just punishment for the offense," and "to
afford adequate deterrence to criminal conduct." 18 U.S.C. §
3553(a)(2)(A),(B). To the extent that, because of mental
illness, a defendant does not understand rationally why he is
being punished, it would offend due process to impose
punishment.  While a sentence may be just in terms of the fit
between the sentence and the crime, its retributive purpose is
undermined if it is imposed on a person who fails to understand
because of mental illness why it is being imposed. Similarly, if
the defendant, because of mental illness believes that he is
being punished for a reason other than his illegal conduct, the
purpose of individual deterrence would be undermined.  The
defendant would perceive that the reason he is being punished is
not to prevent him from committing the same crime, but rather
for another wholly irrational purpose.

In Panetti v. Quarterman, 127 S. Ct. 2842, 2862 (2007), the
Supreme Court recently confirmed that the standards of
competency are specific to the proceeding at issue.  In that
case, the Supreme Court held that a defendant facing the death
penalty is entitled to a competency determination under the
Eighth Amendment before his sentence is imposed.  Id. at 2860.

To be found competent, such a defendant must have some "rational understanding" of the reason for his execution. Id. "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." Id. at 2862. As the Court explained, "The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question. . . if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." Id. at 2861. The Court acknowledged that "a concept like rational understanding is difficult to define." Id. at 2862. The Court declined to "set down a rule governing all competency determinations," but held that the trial court should have considered the defendant's "severe, documented mental illness" before dismissing his claim of incompetence. Id. The Court made it clear that in a capital case, there must be a causal relationship between the defendant's mental illness and the failure to understand the purpose of the execution:

> Someone who is condemned to death for an atrocious murder
> may be so callous as to be unrepentant; so self-centered
> and devoid of compassion as to lack all sense of guilt; so
> adept at transferring blame to others as to be considered,
> at least in the colloquial sense, to be out of touch with
> reality. . . . The beginning of doubt about competence . .
> . is not a misanthropic personality or an amoral character.
> It is a psychotic disorder.

<u>Id</u>.  The Court concluded:

> Petitioner's submission is that he suffers from a severe,
> documented mental illness that is the source of gross
> delusions preventing him from comprehending the meaning and
> purpose of the punishment to which he has been sentenced.
> This argument, we hold, should have been considered.
> . . .Gross delusions stemming from a severe mental disorder
> may put an awareness of a link between a crime and its
> punishment in a context so far removed from reality that
> the punishment can serve no proper purpose. <u>Id</u>.

The principles that the Court explained in <u>Panetti</u> spring

from the Court's interpretation of "rational understanding" as

applied to an execution for purposes of the Eighth Amendment.

The same requirement of "rational understanding" applies to the

determination of competence under the due process clause.

**B.**

There is no question that Mr. Wolfson possesses significant

psychological capabilities in connection with his sentencing.

He understands the charges for which he has been convicted and

can discuss with his lawyer the underlying facts.  He

understands the legal defenses his attorney has raised and

believes that they are persuasive.  He is aware of the possible

sentences that he faces and can assist his counsel in preparing

for sentencing.  He is able to participate in the proceedings in

an appropriate manner.

However, it is also clear that Mr. Wolfson is suffering from a severe mental illness.  While Dr. Drob and Dr. Kleinman differ on their diagnosis of the severity of the mental illness neither disputes that Mr. Wolfson is suffering from a severe mental illness that produces delusions, and that those delusions have worsened over time and now infect the defendant's understanding of this case.  In particular, he believes that the case, including the sentencing proceeding, are motivated by an effort by the Government to silence him so that he does not disclose a wide-ranging conspiracy involving the President of the United States, the FBI, the CIA and the National Football League.  While he does not believe that his current attorney is part of that conspiracy, he does believe that various prosecutors are part of that conspiracy, and his view of the Court is ambiguous.  These delusions prevent him from having a rational understanding of the motivation for his sentencing.  He thus lacks a rational understanding of why he is being sentenced.

Moreover, it is also clear that the defendant's mental illness has impaired his ability to participate in the sentencing proceeding because he lacks the sufficient present ability to assist his lawyer with a reasonable degree of rational understanding and to participate in the sentencing

proceeding with a reasonable degree of rational understanding. One of the critical parts of the sentencing proceeding is the ability of the defendant to address the Court. The defendant is not required to address the Court, and the defendant is plainly not required to express remorse, particularly when the defendant has gone to trial and has the ability to appeal his conviction. Nevertheless, it is clear that the defendant's mental illness has impaired his ability to decide whether to address the Court and what to say to the Court, and to consult with his lawyer on that subject, because his current belief is that he is not guilty of the crimes, not only because they are legally insufficient, but because they are being prosecuted against him to silence him.

The Government argues that the defendant has a history of fraud and that there is reason to question the sincerity of his delusions. However, the psychological tests administered by Dr. Drob indicated that the defendant is not malingering. Dr. Drob was clear that the defendant is not malingering. Moreover, Dr. Kleinman did not question the sincerity of the defendant's beliefs and did not conclude that the defendant was malingering. There is, in short, no evidence that the defendant is malingering and the Court concludes that the defendant is not malingering and that the delusions he has expressed to Dr. Drob

and Dr. Kleinman are sincerely held and are the product of a serious mental illness.

Moreover, there is little incentive for the defendant to falsify his delusions for purposes of sentencing. If, after conviction and prior to sentencing, the court finds that the defendant is presently suffering from a mental disease or defect, and that the defendant should be committed to a suitable facility for care or treatment, the court shall commit the defendant to the custody of the Attorney General for hospitalization in an appropriate facility. Such commitment constitutes a provisional sentence of imprisonment to the maximum term authorized by law for the offense for which the defendant was found guilty. See 18 U.S.C. §4244(d). The maximum sentence that the defendant faces for the crimes for which he was convicted far exceeds the Guideline Sentence recommended by the Probation Department.

There is no psychological or psychiatric expert testimony that the defendant is competent to be sentenced. Both Dr. Drob and Dr. Kleinman had questions as to what the standard was to be applied to competency to be sentenced. Nevertheless, both Dr. Drob and Dr. Kleinman concluded that Mr. Wolfson was suffering from a mental disease that produced a delusional misperception of the reason that the government was prosecuting him and

impaired the defendant's ability to exercise his right to speak on his own behalf at sentencing. Significantly, Dr. Kleinman, a very credible expert psychiatrist testified unequivocally that the defendant was competent at the time of his trial and guilty plea. However, Dr. Kleinman forthrightly was not prepared to opine that Mr. Wolfson was competent to be sentenced.

For the reasons explained above, the Court finds that, because of a mental disease or defect, the defendant lacks the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and lacks a rational understanding of the proceedings against him. It is therefore clear that the defendant is currently not competent to be sentenced.

## Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law. The Court has considered all of the arguments by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

For the reasons explained above, the defendant's motion to vacate the jury verdict in the Five Stock Indictment and the guilty plea because of incompetence to stand trial and plead guilty, and because of alleged ineffective assistance of counsel is **denied.**

The defendant's application to find the defendant incompetent to be sentenced at this time is **granted**.

The parties have not briefed the appropriate order to be issued upon a finding of incompetence to be sentenced. See 18 U.S.C. §4244(d). The parties should confer and submit an agreed upon order within five days. If the parties are unable to agree, the parties should submit proposed counter-orders within eight days.

SO ORDERED.

Dated: New York, New York
      May 2, 2008

John G. Koeltl
United States District Judge